FILED

03/31/2017

Clerk of the
Appellate Courts



IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 16, 2016

## CHARLES E. WAGNER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 104551   Steven W. Sword, Judge**

_____

**No. E2016-00823-CCA-R3-PC**
_____

The Petitioner, Charles E. Wagner, appeals the Knox County Criminal Court's denial of his petition for post-conviction relief from his 2011 convictions for especially aggravated kidnapping, aggravated kidnapping, kidnapping, aggravated assault, assault, aggravated criminal trespass, and false imprisonment and his effective nineteen-year sentence. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Leslie M. Jeffress, Knoxville, Tennessee, for the appellant, Charles E. Wagner.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from three incidents involving the Petitioner, Sylvia Wagner, who was the Petitioner's then-estranged wife, and William Hardy, who was Ms. Wagner's boyfriend at the time of the offenses. An incident on July 14, 2008, resulted in the Petitioner's pleading guilty to assaulting Mr. Hardy. An incident on July 17, 2008, resulted in the Petitioner's being charged with the aggravated burglary of Mr. Hardy's home. An incident on August 4, 2008, resulted in the Petitioner's being charged with three counts of aggravated assault against Mr. Hardy, four counts of the especially aggravated kidnapping of Ms. Wagner, and four counts of the aggravated kidnapping of Ms. Wagner. *See State v. Charles Edward Wagner,* No. E2012-01144-CCA-R3-CD, 2014 WL 60971, at *1 (Tenn.

Crim. App. Jan. 8, 2014), *perm. app. denied* (Tenn. Sept. 19, 2014). The Petitioner was ultimately convicted and appealed his convictions, and this court affirmed the convictions and summarized the facts of the case as follows:

The State's first witness [at the trial] was Michael Mays, the 9-1-1 records manager. Through Mr. Mays, the State introduced recordings of one 9-1-1 call placed on July 14, 2008; one call placed on July 17, 2008; and five calls placed on August 4, 2008.

Ed Johnson, an officer with the Knoxville Police Department forensic unit, . . . responded to the scene at West High School and photographed various pieces of evidence that were arranged on the hood of a Ford van. The items included: a cellular telephone, gloves, a mask, an identification card, a wallet, a knife, a flashlight, a [Taser], a camera, and a stick. He also took photographs of Ms. Wagner at the University of Tennessee Medical Center.

. . . .

. . . On August 4, 2008, [Jason] Ware left his home to drive to a grocery store. As he was driving, he observed a man later identified as appellant "forcibly" taking a female across the street. Mr. Ware described that appellant held the victim, later identified as Ms. Wagner, in a "headlock" and was walking with a stick in his other hand. Appellant was wearing dark-colored clothing, and it appeared to Mr. Ware that appellant and Ms. Wagner were emerging from someone's yard and not walking along the street. Mr. Ware dialed 9-1-1 and turned his vehicle around. As Mr. Ware approached the scene again, he entered the parking lot of West High School and shined his headlights on appellant as he was attempting to force Ms. Wagner into his van. Another truck pulled beside Mr. Ware and positioned itself similarly. They waited for the police to arrive and departed shortly after their arrival. Mr. Ware described the van as a "custom" van that was gold, tan, brown, or cream in color.

Mr. Ware confirmed that he discerned the scene to be an "aggressive situation" and that Ms. Wagner was being dragged or pulled. He stated, "[Appellant] was putting this woman into his vehicle forcibly."

Nickalas Hardy testified that he is Bill Hardy's son, and his grandmother's name is Kathleen Hardy. Sylvia Wagner was his father's [fiancée] at the time of the trial. In 2008, he, Mr. Hardy, Ms. Wagner, and her son Zack Cagle resided together on Greenleaf Avenue, which was located

-2-

close to West High School. Nickalas stated that in July 2008, he suffered from torn ligaments in his ankle and required crutches to walk. On July 17, 2008, Nickalas, Mr. Hardy, Ms. Wagner, and Mr. Cagle were present at the home on Greenleaf Avenue. Appellant arrived at the residence and "pound[ed]" on the door, demanding to see Ms. Wagner. Although Ms. Wagner was present, occupants of the home told appellant she was not there. Appellant kicked in the door and "stormed" through the house. Ms. Wagner locked herself in a bathroom. Occupants shouted at him to leave, and after a "minute or two," appellant left the home. Someone called 9-1-1, and police responded after appellant had left.

On August 4, 2008, Ms. Wagner, Mr. Cagle, Mr. Hardy, and Nickalas were at the residence. Mr. Hardy was planning to drive Mr. Cagle and Nickalas to a friend's house to spend the night. Ms. Wagner was going to accompany them. Mr. Hardy was moving the vehicle as the other passengers were preparing to enter the vehicle when appellant ran toward them wearing all black clothing and a mask and carrying a stick. Appellant began hitting Mr. Hardy with the stick as Mr. Hardy attempted to exit his vehicle. Appellant dragged Mr. Hardy out of the vehicle, and after Mr. Hardy was on the ground, appellant continued to strike him. Mr. Hardy attempted to block the blows. Nickalas recalled that Ms. Wagner jumped onto appellant's back to stop him. Appellant turned toward Ms. Wagner and struck her in the jaw, then "grabbed her by her head and started pulling her down the driveway . . . ." He accomplished this by placing Ms. Wagner in a "headlock" and pulling her by her hair. Nickalas stated that appellant yelled that if anyone followed him, he would kill her. Ms. Wagner shouted for everyone to "stay back." Nickalas also saw appellant strike Ms. Wagner in the face.

Nickalas and Mr. Cagle remained back and called 9-1-1. Mr. Cagle then ran to a neighbor's house and knocked on the door, but no one answered. He continued to knock on doors in an attempt to obtain assistance. They followed at a distance and could see appellant as he forced Ms. Wagner to walk toward the high school. Appellant then "threw" her into a van. Nickalas was still on the telephone with the 9-1-1 operator. Nickalas saw the van's headlights turn on and told the operator that appellant and Ms. Wagner were about to leave. Police arrived shortly thereafter, before the van could pull away. Officers removed appellant and Ms. Wagner from the van, placed them against the van, and handcuffed them both. The 9-1-1 operator asked to speak with Mr. Hardy, so Mr. Cagle ran back to the residence to take the telephone to Mr. Hardy.

. . . Kathleen Hardy, Mr. Hardy's mother and Nickalas's grandmother[,] . . . testified that on July 14, she . . . heard a noise coming from her driveway and ran to the door. She found Mr. Hardy bleeding and saying, "'Let me get in, let me get in, I think he's gonna kill me.'" She opened the door, and Mr. Hardy fell into the home. Ms. Hardy dialed 9-1-1. She noticed that Mr. Hardy's face was bleeding.

Ms. Hardy recalled a subsequent incident when she was in her bedroom, and Mr. Hardy said, "'Mama, come in here, he's back again . . . ,'" and asked her to sit in the living room with them. She then heard a loud noise, and appellant kicked in her door. Ms. Hardy stood up and placed herself between appellant and Mr. Hardy. She yelled at appellant to get out of her house. Appellant turned and ran from the house. Police officers responded to the incident.

Ms. Hardy testified about another occasion when she heard a noise in her driveway, and Mr. Hardy, who was again hurt, was trying to get into the house. She knew that a man who was dressed in black took Ms. Wagner against her will. She called 9-1-1 and told the operator that appellant had taken a hostage.

Sylvia Wagner, the victim of all counts of the offenses involving kidnapping, testified . . . that she married appellant in 2000 and that appellant moved most of his belongings out of their home in May 2008. Prior to appellant's moving out, she had suffered physical abuse at his hands. She described an incident wherein appellant shoved her against the corner of a dresser, leaving a large bruise on her back. Ms. Wagner stated that she had known Mr. Hardy for twenty-seven years and that they had dated long ago. After she and appellant separated, she began seeing Mr. Hardy again.

Ms. Wagner stated that on July 14, 2008, she drove to Mr. Hardy's home after leaving work. She had just exited her vehicle and was standing outside talking with Mr. Hardy when she saw someone approach them from the neighbor's yard. She realized it was appellant, and appellant began hitting Mr. Hardy. Appellant knocked Mr. Hardy to the ground and continued to strike him. Mr. Hardy was attempting to stand up, stumbling, and trying to get into his house. Appellant continued hitting Mr. Hardy and eventually "busted his eye open." Mr. Hardy eventually entered his home, and appellant left.

Ms. Wagner recalled that on July 17, 2008, appellant beat on the door and kicked it in. Appellant entered the home and demanded that she

-4-

accompany him outside because he wanted to talk with her. She went to the bathroom and locked the door. She could hear Ms. Hardy tell appellant to leave, which he eventually did.

Ms. Wagner testified that on August 4, 2008, she and Mr. Hardy were going to drive Nickalas and her son, Zack, to a friend's house. Mr. Hardy was going to back up the vehicle because it was parked very close to an adjacent vehicle and the passenger side doors were blocked. She heard Nickalas say something and looked to see what he was talking about. She saw appellant dressed in black with a black hood covering his face and carrying a large stick. Appellant began striking Mr. Hardy with the stick as Mr. Hardy attempted to exit the vehicle. Appellant knocked Mr. Hardy to the ground. She yelled for appellant to stop and jumped onto his back, "trying to keep [appellant] from killing [Mr. Hardy]." Ms. Wagner stated that appellant hit her in the head with the stick as he was "slinging" it around to hit Mr. Hardy. Appellant removed Ms. Wagner from his back, placed her in a headlock, grabbed the back of her hair, and dragged her down the street. He also struck her in the jaw. Ms. Wagner screamed at appellant that she did not want to go with him. She stated that she could barely breathe at that point. She recalled that in addition to the large stick, appellant also had a knife.

Ms. Wagner stated that appellant dragged her to the parking lot of West High School where he shoved her toward a van, opened the door, and tried to force her into it. He pushed her in through the driver's side door, and she attempted to escape through the passenger side door. Appellant told her that if she opened the door, he would kill her. Appellant tried to start the van, but police arrived at that time. Officers removed Ms. Wagner and appellant and placed them in separate patrol cars while they gathered information. She was permitted to exit the car after a few minutes. Officers spread out several items on the hood of the van that they had taken from appellant. Ms. Wagner sought medical treatment at the emergency room for the injury to her jaw, and she obtained follow-up care the next day.

. . . .

On redirect examination, Ms. Wagner indicated that appellant had pressured her not to appear in court to testify and that the day before she testified, she found a threatening note on her vehicle's windshield. She also clarified that following the first encounter between appellant and Mr. Hardy, appellant scattered her belongings in Mr. Hardy's driveway. After she gathered her things, she drove away, and appellant called her on her cellular

-5-

telephone. He demanded that Ms. Wagner drive to his father's house and threatened to "run [her] off the road" if she did not comply. She drove to his father's house as instructed, and once there, appellant began "slinging [her] around." She struck her head on a wall, causing a hole in the wall.

William "Bill" Hardy . . . testified that he and Ms. Wagner had dated when they were younger and that they became reacquainted through a chance meeting at a store in 2008. He recounted the events of July 14, 2008, stating that he and Ms. Wagner were in his driveway talking when her "eyes start[ed] getting big . . . ." As he turned to perceive what was happening behind him, he was struck. As Ms. Wagner yelled for appellant to stop, Mr. Hardy attempted to run inside his home. He was on the porch when appellant struck him again, and Ms. Wagner attempted to stop the attack by dragging appellant away from Mr. Hardy. However, appellant caught Mr. Hardy and punched him in the face several times. Kathleen Hardy, Mr. Hardy's mother, opened the door to the house, and Mr. Hardy was able to get inside. The ambulance responded to the scene and transported Mr. Hardy to the hospital. He received stitches over his eye and suffered a fracture to the orbit.

On July 17, 2008, Mr. Hardy recalled that appellant approached the back door, so Mr. Hardy immediately called the police. He gathered his family members, and they sat in the living room with the lights off. Appellant kicked in the door, and Mrs. Hardy stood up and began yelling at appellant. Nickalas also arose from his seat, and appellant left the residence.

Mr. Hardy recalled that on August 4, 2008, around 9:00 p.m., he, Ms. Wagner, Zack Cagle, and Nickalas were about to leave to drive the children to a friend's house. As he backed up the vehicle, he turned around and saw someone dressed all in black with a mask covering his face and carrying a stick. Mr. Hardy tried to exit the vehicle, but appellant struck him in the head with the stick. Mr. Hardy stumbled out of the vehicle and was hit several more times. Ms. Wagner dragged appellant away from Mr. Hardy, but appellant caught him as he was trying to go inside his home and dealt several more blows with the stick. Once Mr. Hardy gained entry to his home, he called the police and explained the urgency of the situation. Shortly thereafter, Mr. Cagle entered the home and informed Mr. Hardy that the police had apprehended appellant with Ms. Wagner at West High School. An officer arrived and escorted Mr. Hardy to the school. The officer picked up the stick from the ground in front of appellant's van and asked Mr. Hardy if that was the weapon with which appellant struck him, and Mr. Hardy confirmed that it was. Mr. Hardy sought medical attention at the emergency room.

. . . Zack Cagle, Ms. Wagner's son, . . . explained the events of August 4, 2008, and stated that as Mr. Hardy was backing up his vehicle, appellant ran toward them, dressed in all black and wearing a ski mask over his face. Appellant began to hit Mr. Hardy with a stick that he was carrying, and Ms. Wagner jumped on appellant's back to stop him. Mr. Hardy was able to enter his home, and appellant then struck the victim in the jaw with his fist and grabbed her around the neck. Appellant began walking with Ms. Wagner toward West High School with the stick still in his hand. Mr. Cagle said that it appeared to him that appellant was pulling her hair as they walked. Ms. Wagner was "squirming" and attempting to free herself from appellant's grasp. He and Nickalas, who was on the telephone with 9-1-1, followed behind. Mr. Cagle was scared because he thought he would never see his mother again.

When appellant and Ms. Wagner arrived at the high school parking lot, Mr. Cagle witnessed appellant "throw" her into his van. Ms. Wagner had both of her hands on each side of the door trying to resist appellant, but she was unsuccessful. Mr. Cagle stated that it took "a second" for appellant to start the van, during which time the police arrived. Officers pointed their weapons at the van, ordered the occupants to exit, and placed them against the van. They then questioned each individual in separate patrol cars.

. . . [A]ppellant recalled Mr. Hardy as his first witness. [Mr. Hardy] confirmed that he alleged that appellant assaulted him on two occasions and that following the first assault, he sought and obtained an order of protection against appellant. Less than thirty days later and following the August 4 assault, he requested dismissal of the order of protection, stating that "[they] came to an understanding." Mr. Hardy acknowledged that after the court date at which he obtained the dismissal, he and appellant "stood around and talked for awhile [sic] . . . ." He stated that he asked for the dismissal because he "was afraid of what [appellant] may do if [he] continued to aggravate him, so . . . it was probably stupid of [him] to do, but [he] thought [he] was doing the right thing to protect [his] family." He further said that appellant had told him that he was worried that his daughter would grow up without her father, and because Mr. Hardy reared his daughter by himself, he "connected" with appellant on that point. In addition, Mr. Hardy said he had been taught to "forgive and forget."

On cross-examination, Mr. Hardy agreed that the "piece of paper" did not stop appellant from attacking him on August 4.

Appellant called his daughter, Megan Wagner, as his next witness. She stated that at some point following these incidents, Ms. Wagner approached her at a grocery store and engaged her in conversation with appellant standing nearby. Appellant did not speak to Ms. Wagner and did not look at her. Megan and appellant walked Ms. Wagner to her vehicle at her request and talked with her as she put away her groceries. According to Megan, Ms. Wagner then received a telephone call and said, "That was Bill, he said he was coming down here." Appellant responded, "Tell Bill not to come down here. . . . I don't want no [sic] conflict." Ms. Wagner agreed, and then she and appellant hugged each other.

On a separate occasion, Megan and appellant were shopping at Walmart, and Megan heard Ms. Wagner call her name. They engaged in conversation, and Ms. Wagner began showing her baby pictures of her grandchild. Appellant rounded the corner and saw them talking, then stopped. Ms. Wagner turned to appellant and showed him the photographs, also. After talking about the baby for a short time, the conversation lulled and became "silent and awkward," so Megan suggested that they leave. On neither occasion did Ms. Wagner display any fear or apprehension. Megan described the encounters as "a civil conversation like old friends."

On cross-examination, Megan admitted that although Ms. Wagner treated her nicely "overall," while appellant and Ms. Wagner were married, she had prevented Megan from seeing appellant's side of the family, punished her, made her clean the entire house by herself, and kept her from her friends. Megan mentioned a third encounter with Ms. Wagner when Megan was shopping at Walmart with appellant and her grandmother. She confirmed that appellant would only speak to Ms. Wagner after she spoke to him first.

Megan stated that when she learned that appellant had been accused of these incidents, she asked him why he had done these things. Appellant answered that "he was trying to protect his family." He admitted to her that he had struck Mr. Hardy with a stick, but he did not tell her that he had kicked in his front door, punched the victim, or dragged her down the street in a headlock. Appellant told Megan that after he struck Mr. Hardy, he and Ms. Wagner walked down the street together with his arm over her shoulder. Although she recognized the knife that appellant had carried on August 4 as coming from their home, she was not aware that he had been in possession of it that night.

-8-

Appellant's mother, Dorothy Peacock, . . . testified that after appellant was arrested, he telephoned her from jail, and as a result, she placed a call to Ms. Wagner and asked her to go see appellant in jail. Ms. Peacock relayed the encounter at Walmart between herself, Megan, appellant, and Ms. Wagner. Ms. Peacock stated that when Ms. Wagner began walking toward them, she walked away, but appellant and Megan remained in place. She could not hear the ensuing conversation, but she did not observe anything unusual about the interaction among the parties during their ten-to-fifteen-minute conversation. Occasionally, Ms. Peacock would see the parties "grin."

On cross-examination, Ms. Peacock stated that appellant told her that he struck Mr. Hardy on July 14 because he saw "Mr. Hardy rubbing [the victim's] butt." She did not know about the July 17 incident wherein appellant kicked in Mr. Hardy's door. Regarding the August 4 incident, appellant told Ms. Peacock that he struck Mr. Hardy in the head with a stick, but he did not tell her that he punched Ms. Wagner in the face, placed her in a headlock, or forced her into the van. Ms. Peacock said that appellant told her he "helped" Ms. Wagner into the van after they walked to the van with his hand on her neck. She also indicated that "it's not unusual for [appellant] to have a pocketknife." When asked if she ever saw bruises on Ms. Wagner during the course of her nine-year relationship with appellant, Ms. Peacock answered, "Not on her." The State asked, "[A]re you saying that you saw some on him?" Ms. Peacock responded, "I most definitely did," and said that the bruises were inflicted by Ms. Wagner.

Appellant called his sister, Kelly Bragg, . . . [who] testified that approximately two weeks after appellant was released from jail, she arrived at his house and noticed Ms. Wagner's vehicle in the driveway. When she entered the residence, Ms. Wagner and appellant were in the kitchen. Ms. Bragg turned around and left.

Appellant's next witness was John Alan Smith, who had known appellant for over thirty years. Mr. Smith described appellant as being "like a brother." He visited appellant at his home after he was released from jail in August 2008, and Ms. Wagner was present, sitting on a sofa. Mr. Smith stated that there was nothing unusual about the interaction between appellant and Ms. Wagner at that time and that they acted "normally" toward each other. On cross-examination, Mr. Smith denied that appellant had told him the details of the incidents involving Mr. Hardy and Ms. Wagner.

Lawrence Melon, appellant's nephew, [testified that he] . . . accompanied appellant to deliver Ms. Wagner's vehicle to her "a day or two" after the August 4 incident. At that time, he did not notice anything amiss with Ms. Wagner, and he reported that she joked with him as she always had.

Paul Duncan, appellant's grandfather, visited appellant a few days after his release from jail. When he arrived around 8:00 or 8:30 a.m., he noticed Ms. Wagner's vehicle parked in appellant's driveway. When he went inside, appellant and Ms. Wagner were seated at the table eating breakfast together. Mr. Duncan drank a cup of coffee and talked with them. As he prepared to leave, he recalled that Ms. Wagner said, "I've gotta go home and get some clothes." He testified that she added that she was sorry that this had happened and that she "'told the policemen that [she] didn't want to press charges[,] but they wouldn't listen.'"

The State called Sergeant Ryan Flores with the Knoxville Police Department as a rebuttal witness. He testified that he prepared the affidavits and signed the warrants as the affiant in this case. After reading the affidavits to the jury, Sergeant Flores read the bond condition, which stated that appellant was to have no contact with the victims or witnesses involved in the case.

On cross-examination, Sergeant Flores acknowledged that he stated in the affidavit that appellant had struck Ms. Wagner in the face with the stick but that no evidence was presented at trial to support that statement. He also confirmed that although appellant was in possession of a knife and a [Taser] at the time of his arrest, there was no evidence that he used either of those weapons during the commission of the offenses.

The State then called Andrew Anderson, who testified that he knew appellant and Ms. Wagner and had worked with them at a wrecker service. He had witnessed bruises on Ms. Wagner "quite a few" occasions. He had also observed her with a black eye a "few" times. Mr. Anderson reported that appellant had explained that he sometimes had nightmares and had awakened from a nightmare and struck Ms. Wagner. He opined that Ms. Wagner was involved in an abusive relationship with appellant, elaborating:

> Well, when somebody has bruises on [her] arms about the size of somebody's thumbs, when somebody has bruises on [her] . . . neck, when [somebody] [has] bruises on [her] face, generally, how can you construe anything other than that? Also,

-10-

the fact that he's very aggressive and – from what I've seen from him anyway [–] and the fact that he's had numerous altercations with other drivers at the shop, . . . how would you draw that conclusion?

Mr. Anderson stated that during the two years he worked with appellant and Ms. Wagner, "she always had a different bruise somewhere else on her body."

The State recalled Ms. Wagner, who further explained an April 2008 incident of abuse wherein appellant picked her up and "slammed" her into the corner of a dresser. This resulted in a large bruise on her back in the rib area. She also developed blood in her urine, which caused her to seek medical attention. She explained the cause of her injury to her medical providers, and they counseled her concerning the abuse. Ms. Wagner informed them that she and appellant were seeing a marriage counselor and that she had considered leaving him but was not ready to do so at that time. On cross-examination, Ms. Wagner denied having visited appellant at his father's home at any time following the August 4 incident.

Following Ms. Wagner's testimony, the State again rested its case. Following deliberations, the jury returned guilty verdicts as follows: count 2 – 4 aggravated criminal trespass as a lesser-included offense of aggravated burglary; counts 4 and 5 – aggravated assault; counts 6 and 7 – aggravated kidnapping as lesser-included offenses of especially aggravated kidnapping; count 8 – especially aggravated kidnapping; count 9 – false imprisonment as a lesser-included offense of especially aggravated kidnapping; counts 10, 12, and 13 – aggravated kidnapping as charged in the indictment; and count 11 – kidnapping as a lesser-included offense of aggravated kidnapping.

*Id*. at *1-8 (footnotes omitted).

On December 3, 2014, the Petitioner sought post-conviction relief. He filed a pro se petition, and after the appointment of counsel, two amended petitions were filed by post-conviction counsel. The Petitioner's allegations for relief were limited to the ineffective assistance of counsel. In the appeal of the conviction, the Petitioner alleged multiple grounds of ineffective assistance of trial counsel, and this court denied relief on those grounds. *Id*. at *11-14. In the present petition, the Petitioner sought post-conviction relief on the basis that his post-trial attorneys provided ineffective assistance. The focus of the Petitioner's ineffective assistance allegations was subsequent counsel, who represented him at the motion for a new trial hearing, and appellate counsel, who represented him in the appeal of his

convictions. Our recitation of the evidence from the post-conviction hearing is limited to that which is relevant to the issues raised in the present appeal.

At the post-conviction hearing, the Petitioner testified that he had difficulty hearing at the trial because he had 70% "tone deafness" and that he had lived his entire life with only 30% hearing ability. The Petitioner said that he told trial counsel about his disability, that trial counsel said the trial judge was going to attempt to obtain hearing assistance equipment, that counsel later stated the judge was unable to obtain any equipment, and that counsel did not object to proceeding with the trial in the absence of any equipment. The Petitioner said he could not hear well during the trial and only understood "bits and pieces" of the testimony. He said that he did not have the assistance of a hearing aid and that he was not able to participate fully in his defense.

The Petitioner testified that he told his subsequent counsel, who represented him at the motion for a new trial hearing, about his hearing disability, that counsel raised the issue with the judge, and that that the judge permitted the Petitioner to use the court reporter's headphones. He said, however, that the headphones had a "delayed reaction in response to the voices." He said that although he heard one person speaking through the headphones, a different person would be speaking in live time and that this delay prevented him from following who was speaking during the motion for a new trial hearing.

The Petitioner testified that trial counsel did not request a severance regarding the three incidents alleged in the indictment, that he and counsel did not discuss attempting to obtain a severance, and that he did not recall the issue being addressed in the trial court. The Petitioner believed the trial court would have granted a motion to sever the incidents. He said that he had already pleaded guilty to charges related to the July 14 incident and that the July 14 incident should never have been mentioned at the trial. He said that the July 17 incident had occurred weeks before the incident involving the stick and that the incidents should have been tried separately. He believed the outcome of his case would have been different had the incidents been tried separately.

The Petitioner testified that subsequent counsel raised the severance issue in the written motion for a new trial but that counsel withdrew the issue at the hearing. The Petitioner agreed appellate counsel raised the severance issue on appeal in the context that trial counsel provided ineffective assistance by failing to raise the issue before the trial but that this court refused to review the claim because it was raised for the first time on appeal.

The Petitioner testified that during jury selection, a prospective female juror responded to the prosecutor's asking the panel if anyone had "experienced domestic violence." The Petitioner recalled that the juror responded her aunt had been killed by her

-12-

aunt's previous boyfriend, that the prosecutor questioned the juror further in the presence of the other prospective jurors, and that trial counsel did not object.

The Petitioner testified that the State argued the stick used during the last incident was a deadly weapon because of the manner in which it was used. He said, though, that no serious injuries were caused during the incident and that the injuries were only inflicted at or below the waist. He said trial counsel conceded during closing argument that the stick was a deadly weapon and that the Petitioner had assaulted Mr. Hardy.

The Petitioner testified that on the second day of the trial, Ms. Wagner testified that she had found a note on her vehicle and that she did not know who left it. The Petitioner recalled that trial counsel did not object to the admission of the note, although the Petitioner told trial counsel that the note did not contain the Petitioner's handwriting and that it looked as though Ms. Wagner wrote the note. The Petitioner stated that a handwriting expert testified at the motion for a new trial hearing that Ms. Wagner wrote the note. The Petitioner said that trial counsel should have attempted to have the evidence excluded because of its prejudicial nature and that the note stated, "I [am] going to get you in seven point five days." The Petitioner said that subsequent counsel raised ineffective assistance in the written motion for a new trial relative to trial counsel's failure to object to the note but that subsequent counsel did not ask trial counsel questions regarding this issue at the hearing. The Petitioner recalled that appellate counsel raised the issue on appeal but that this court declined to review the issue because subsequent counsel did not question trial counsel about the note.

The Petitioner testified that trial counsel did not object to the State's questioning a potential juror during jury selection and that subsequent counsel raised the issue in the context of ineffective assistance of counsel in the written motion for a new trial. The Petitioner said, though, that subsequent counsel did not question trial counsel about his failure to object to the State's questioning of the juror. The Petitioner recalled subsequent counsel's stating that he was not going to ask trial counsel questions at the motion for a new trial hearing because trial counsel had not testified to anything that "hurt" the Petitioner. The Petitioner said that appellate counsel raised the issue on appeal but that this court was unable to consider the issue because subsequent counsel did not question trial counsel about his failure to object.

On cross-examination, the Petitioner testified that his hearing aid was not functioning properly at the time this case was pending and at the time of the trial. The Petitioner stated that although initially he could not hear the trial judge during the *Momon* hearing, he could hear the judge after the judge spoke louder into the microphone. The Petitioner said that trial counsel's strategy was to show the jury that the Petitioner was heartbroken after his marriage ended and that the Petitioner was attempting to save his marriage.

The Petitioner testified that subsequent counsel was retained only for the motion for a new trial hearing and that the strategy at the hearing was to show trial counsel provided ineffective assistance. Relative to the Petitioner's hearing disability, the Petitioner agreed that the issue was not raised in the written motion for a new trial but said that he did not agree not to raise the issue.

The Petitioner testified that the issue related to trial counsel's conceding the stick was a deadly weapon was raised on appeal, although it was not raised in the written motion for a new trial. Relative to the note left on Ms. Wagner's car, the Petitioner agreed Ms. Wagner testified that she saw the Petitioner and his family about twenty feet from her car after court recessed on the first day of the trial and that she was pressured not to testify at the trial.

The Petitioner testified that subsequent counsel did not tell him about the danger of raising ineffective assistance claims in a motion for a new trial. The Petitioner said that subsequent counsel told him that if the issue were not raised in the motion for a new trial, the issue could not be raised in a later proceeding.

Subsequent counsel testified that he had practiced law since 1981 and that his practice consisted of mostly criminal defense. Relative to the motion for a new trial, counsel stated that he and the Petitioner discussed the trial in detail, that the Petitioner's primary concern was trial counsel's performance, and that subsequent counsel advised the Petitioner that raising ineffective assistance claims in a motion for a new trial was not recommended. However, subsequent counsel said that the Petitioner wanted ineffective assistance raised in the motion and that he and the Petitioner discussed the pitfalls of raising an ineffective assistance claim outside a petition for post-conviction relief.

Subsequent counsel testified that he raised forty-two issues in the motion for a new trial and that although he did not recall the motion hearing, he said his usual practice was to tell the trial court that the defense stood on its motion but would brief the court on any issue the court deemed necessary.

Subsequent counsel testified that he had a handwriting expert review the note left on Ms. Wagner's car during the trial and that counsel obtained bank records showing Ms. Wagner had forged the Petitioner's signature. Relative to the expert, counsel recalled the expert concluded that the note was not written by the Petitioner and that the handwriting had Ms. Wagner's handwriting characteristics. Subsequent counsel said that trial counsel did not object to the admission of the note and that subsequent counsel thought the failure to object resulted in ineffective assistance. Subsequent counsel said that trial counsel's responses at the motion hearing were that trial counsel's decisions were based upon strategy and that subsequent counsel believed trial counsel would have relied upon strategy regardless of the questions subsequent counsel asked at the motion hearing.

Subsequent counsel testified that he could not recall his reason for withdrawing the severance issue at the motion hearing but said it was possible he withdrew it because the issue was never addressed before the trial. Subsequent counsel did not recall having any specific conversation with trial counsel about the severance issue but said he obtained trial counsel's file and spoke with trial counsel two or three times.

Subsequent counsel testified that he thought he alleged in the written motion for a new trial that trial counsel provided ineffective assistance for conceding the stick was used as a deadly weapon. Subsequent counsel did not recall discussing the issue at the motion hearing. He recalled also alleging in the motion that the stick was not a deadly weapon as a matter of law but acknowledged this court disagreed. Subsequent counsel could not recall whether he questioned trial counsel at the motion hearing about the stick but said the transcript reflected what occurred at the hearing.

Subsequent counsel testified initially that he did not recall what occurred at the trial or at the motion hearing regarding a prospective female juror who admitted during jury selection that the juror's aunt was murdered by the aunt's boyfriend. Subsequent counsel later recalled the juror's statement and said he would have requested that the juror be excused for cause. Subsequent counsel believed that trial counsel should have objected to the juror's serving on the jury, requested a mistrial, or moved to strike the panel. Subsequent counsel recalled that trial counsel stated at the motion hearing that his decision not to object or to request a curative action was a matter of trial strategy.

Subsequent counsel testified that he did not recall the Petitioner's using the court reporter's headphones during the motion hearing, although counsel knew the Petitioner was hearing impaired. Subsequent counsel said that he and the Petitioner discussed the Petitioner's inability to hear the trial testimony and that counsel did not recall if trial counsel attempted to obtain hearing assistance before the trial. Subsequent counsel agreed that generally, the failure to object or to attempt to rectify an issue in the trial court resulted in waiver of appellate review of the issue but said that an appellate court could still review the issue for plain error. Counsel believed that the errors related to the juror, the note, and the stick affected the outcome of the trial.

On cross-examination, subsequent counsel testified that before filing the motion for a new trial, he obtained a trial transcript to review for any trial errors. Counsel conceded he did not raise an issue related to the Petitioner's inability to hear during the trial and said that had the Petitioner's inability to hear been brought to his attention, he would have included it in the written motion for a new trial. Counsel noted, though, that the Petitioner was "quite cognizant" of the trial testimony. Counsel said that although he explained the pitfalls of raising ineffective assistance of counsel in the motion for a new trial, the Petitioner's primary concern was trial counsel's performance.

-15-

Subsequent counsel testified that he explained to the Petitioner that raising ineffective assistance in a motion for a new trial was not his custom but that the defense could raise it because subsequent counsel was not trial counsel. Subsequent counsel said that it was possible to raise ineffective assistance in the motion for a new trial based upon the circumstances of the case and that if the Petitioner were entitled to relief because of ineffective assistance, the relief would come much sooner.

Upon questioning by the post-conviction court, subsequent counsel testified that he and the Petitioner discussed the trial before counsel received the trial transcripts and that counsel believed the Petitioner knew what had occurred at the trial.

Appellate counsel testified that trial counsel filed a motion to sever the Petitioner's case and that trial counsel ultimately withdrew the motion. Appellate counsel said that she did not discuss the matter with trial counsel and that she alleged on appeal that trial counsel provided ineffective assistance by withdrawing the motion. Appellate counsel said that although she did not recall whether the issue was addressed at the motion for a new trial hearing, the issue was alleged in the written motion for a new trial.

On cross-examination, appellate counsel reviewed the State's response to the Petitioner's motion to sever. She said the issues raised on appeal were chosen after speaking with subsequent counsel and another attorney in appellate counsel's office. She noted the attorney had worked in her office for more than fifteen years and had worked on more appeals than anyone else in her office. She said that the ineffective assistance claims had been raised in the motion for a new trial, that those issues had to be raised on appeal, and that whether the Petitioner used a deadly weapon was the most likely issue for which the appellate court would grant relief. She said that she spent considerable time reviewing the record and preparing the brief in this case and that the issues presented in the brief were strategic and based upon her experience and research.

The post-conviction court denied relief. Relative to the Petitioner's hearing abilities, the court found that the Petitioner claimed at the evidentiary hearing that he had 70% hearing loss and that he heard little during the trial and the motion for a new trial hearing. The post-conviction court reviewed the trial transcripts and found that trial counsel told the trial court about the Petitioner's hearing disability and referred to the Petitioner's hearing aid. The post-conviction court found that during the *Momon* hearing, the Petitioner answered the trial court's questions clearly and intelligently, that no additional discussions regarding the Petitioner's hearing occurred, and that the Petitioner did not inform the trial court of any hearing difficulties. The post-conviction court found that subsequent counsel believed the Petitioner was "quite cognizant" of the trial testimony during their discussions before the motion for a new trial was filed.

-16-

The post-conviction court found that although subsequent counsel advised the Petitioner that ineffective assistance was an allegation usually raised in a petition for post-conviction relief, the Petitioner wanted to address trial counsel's ineffectiveness in the motion for a new trial. The court found that although subsequent counsel alleged in the written motion for a new trial that trial counsel provided ineffective assistance by conceding the Petitioner's stick was a deadly weapon, trial counsel was not questioned about the concession at the motion hearing or at the post-conviction hearing. The post-conviction court found that appellate counsel utilized the experience of another attorney in her office in preparing the brief and in choosing the issues to raise on appeal.

The post-conviction court found that although subsequent counsel raised numerous issues related to trial counsel's ineffective assistance, little proof was presented at the motion for a new trial hearing because subsequent counsel relied upon his written motion and the trial record. The court determined that subsequent counsel had an obligation to present sufficient proof to allow the trial and appellate courts to consider the merits of the ineffective assistance allegations. The court determined that subsequent counsel's performance was deficient by failing to present any evidence on these claims. The court determined, though, that the Petitioner failed to establish prejudice because no evidence was presented at the post-conviction hearing showing trial counsel's reasoning for the decisions he made during the trial. The court stated that the record did not reflect whether trial counsel's decisions were strategic. The court determined that even if subsequent counsel had presented the proper proof at the motion for a new trial hearing, no evidence at the post-conviction hearing showed that the outcome of the Petitioner's case would have been different.

The post-conviction court found that subsequent counsel did not provide deficient performance by failing to raise in the motion for a new trial the Petitioner's hearing loss and inability to hear what occurred at the trial. The court credited subsequent counsel's testimony at the post-conviction hearing that the Petitioner had a strong grasp of the trial testimony and noted that the Petitioner did not inform the trial court of any difficulty hearing the trial testimony, although the Petitioner informed the post-conviction court he was having difficulty hearing at the post-conviction hearing. The court found that no evidence was presented at the post-conviction hearing showing how the Petitioner's inability to hear "some of the testimony" affected the outcome of the trial. As a result, the court determined that the Petitioner failed to establish prejudice.

The post-conviction court determined that appellate counsel did not provide deficient performance in choosing which issues to raise on appeal. The court credited counsel's testimony regarding her consulting a more experienced attorney in her office before determining which issues were most likely to result in relief. The court found that appellate

-17-

counsel's decisions were based upon a reasonable understanding of the law and the facts of this case. The court determined the Petitioner also failed to establish prejudice.

The post-conviction court concluded that subsequent and appellate counsel did not provide ineffective assistance of counsel and that all other issues alleged in the petition for post-conviction relief were "rejected" by the court. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Petitioner's ineffective assistance of counsel allegations focus on the motion to sever the charges against him, his inability to hear at the trial, the questioning of a potential juror during jury selection, the concession that the stick was used as a deadly weapon, and the note left on Ms. Wagner's car during the trial.

## I.    Severance

The Petitioner initially states in his brief that appellate counsel erroneously argued in the appeal of the convictions that trial counsel provided ineffective assistance by failing to file a motion to sever the three incidents identified in the indictment. The Petitioner argues that because trial counsel filed but never argued the motion or obtained a ruling from the trial court, trial counsel's ineffectiveness in this regard remains a viable issue for post-conviction relief. The Petitioner argues that had trial counsel obtained a ruling on the motion to sever, the trial court would have granted the motion and that the outcome of his case would have been different. He does not allege subsequent or appellate counsel provided ineffective assistance regarding severance. The State responds that the issue is barred because whether trial counsel provided ineffective assistance was litigated in the appeal of the Petitioner's convictions. We agree with the State.

The Post-Conviction Procedure Act contemplates the filing of a single petition for relief, and our appellate courts have cautioned that raising ineffective assistance of counsel allegations in the direct appeal of the conviction is "fraught with peril." *Thompson v. State*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997); *see* T.C.A. § 40-30-102(c). Ineffective assistance of counsel is a single ground for post-conviction relief. *Cone v. State*, 927 S.W.2d 579, 581-82 (Tenn. Crim. App. 1995). Therefore, "the fact that such violation may be proved by multiple acts or omissions does not change the fact that there remains only one ground for relief." *William Edward Blake v. State*, No. 1326, 1991 WL 35744, at *2 (Tenn. Crim. App. Mar. 19, 1991). After a full and fair hearing at which a petitioner is "afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence," a ground for relief is considered previously determined. *See* T.C.A. § 40-30-106(h). A ground is previously determined "even if the petitioner fails to raise some of the factual bases upon which the rights violation could be based." *William Edward Blake*, 1991 WL 35744, at *2.

The Petitioner alleged the ineffective assistance of trial counsel in his motion for a new trial and in the appeal of his convictions. The Petitioner was given a full and fair hearing on the ineffective assistance of trial counsel allegation at the motion for a new trial

-19-

hearing, and this court determined on appeal that the Petitioner had failed to establish ineffective assistance. Although the Petitioner failed to present all evidence showing trial counsel's alleged ineffectiveness at the motion for a new trial hearing, he was afforded the opportunity to present the evidence. The ineffective assistance claim against trial counsel has been previously determined, precluding its consideration in the petition for post-conviction relief. The Petitioner is not entitled to relief on this basis.

## II.     Petitioner's Hearing

The Petitioner contends that trial counsel provided ineffective assistance by failing to object to beginning the trial when the Petitioner could not hear the trial testimony. He states that subsequent counsel testified at the post-conviction hearing that conducting a trial during which the Petitioner could not hear violated the Petitioner's rights to confront witnesses and to due process. The Petitioner argues that ineffective assistance in this regard was only raised in the petition for post-conviction relief and that it "remains a live issue." He argues that "[t]he failure of his attorneys to recognize his hearing problems and attempt to rectify them amounts to ineffective assistance of counsel." The State responds that the issue is barred because the question of whether trial counsel provided ineffective assistance was litigated in the appeal of the Petitioner's convictions.

As a preliminary matter, we interpret the Petitioner's ineffective assistance argument to focus on trial counsel's failure to request a continuance in order for arrangements to be made to address the Petitioner's hearing difficulty. As we have already concluded, ineffective assistance claims against trial counsel have been previously determined and are not proper in the present post-conviction petition. The Petitioner is not entitled to relief on this basis.

However, the Petitioner's brief states that the "failure of his attorneys" to recognize and rectify his hearing difficulties constitutes ineffective assistance. To the extent that the Petitioner argues that subsequent counsel provided ineffective assistance because he failed to raise in the written motion for a new trial that trial counsel provided ineffective assistance by failing to rectify the Petitioner's hearing difficulties, we conclude that the Petitioner is not entitled to relief. The post-conviction court credited subsequent counsel's testimony, and subsequent counsel testified that had the Petitioner's inability to hear been brought to counsel's attention, counsel would have included an issue related to the Petitioner's hearing in the written motion for a new trial. Subsequent counsel's testimony shows that the Petitioner was "quite cognizant" of the trial testimony. The post-conviction court properly found after reviewing the trial transcript that the Petitioner answered the trial court's questions during the *Momon* hearing clearly and intelligently and without complaint of an inability to hear. We note that the trial transcript also reflects that trial counsel informed the

trial court of the Petitioner's hearing difficulties and referred to the Petitioner's hearing aid. The record does not preponderate against the post-conviction court's findings that subsequent counsel did not provide deficient performance in this regard and that the Petitioner failed to establish prejudice. The Petitioner is not entitled to relief on this basis.

### III. Jury Selection

The Petitioner states in his brief that trial counsel "allowed the state to prejudice the jury against" him "by focusing . . . on domestic abuse affecting one of their number." The Petitioner argues that domestic abuse was "the heart of the state's case," that trial counsel did not object during jury selection, request a mistrial, or request the discharge of the panel, and that subsequent counsel testified at the post-conviction hearing that trial counsel's inaction amounted to ineffective assistance. In the argument portion of his brief, the Petitioner does not identify the relevant portion of jury selection in the trial transcript, identify any specific juror, or state any alleged ineffective assistance by subsequent or appellate counsel. However, based upon the issues raised in the petition and the post-conviction hearing testimony, we interpret the Petitioner's focus to be the female juror identified at the post-conviction hearing. We, likewise, interpret the Petitioner's allegation to be that subsequent counsel provided ineffective assistance by failing to present evidence at the motion for a new trial hearing regarding trial counsel's inaction during the State's questioning of the juror during jury selection. To the extent that the Petitioner alleges trial counsel provided ineffective assistance, consideration of trial counsel's ineffectiveness has been previously determined and is not appropriate for post-conviction relief. The State responds relative to subsequent counsel that the post-conviction court properly determined that the Petitioner failed to establish prejudice.

The record reflects that during jury selection, the prosecutor asked the potential jurors whether the jurors or someone the jurors knew had been a victim of domestic abuse. A female juror responded that her aunt had been killed by her aunt's boyfriend. The record reflects that trial counsel did not object, and counsel's failure was raised in the motion for a new trial as a basis for ineffective assistance. At the motion for a new trial hearing, subsequent counsel did not question trial counsel about his failure to object, and this court concluded on appeal that the failure to question trial counsel about the lack of an objection prevented a showing that trial counsel provided deficient performance or that any deficiency resulted in prejudice. *See Charles Edward Wagner*, 2014 WL 60971, at *13.

The Petitioner did not present trial counsel at the post-conviction hearing to testify about the lack of an objection during jury selection, and subsequent counsel's opinion that trial counsel's inaction amounted to ineffective assistance is not dispositive or evidence of whether trial counsel in fact provided ineffective assistance. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The post-conviction court properly found that

-21-

subsequent counsel provided deficient performance by failing to question trial counsel about jury selection at the motion for a new trial hearing. Trial counsel's testimony regarding his lack of an objection was critical to determining whether subsequent counsel's deficient performance at the motion for a new trial hearing resulted in prejudice. We will not speculate regarding trial counsel's reasons for not objecting during jury selection. The record does not preponderate against the post-conviction court's findings, and the Petitioner is not entitled to relief on this basis.

## IV.    Deadly Weapon

The Petitioner contends that subsequent counsel provided ineffective assistance at the motion for a new trial hearing because he failed to present evidence that trial counsel improperly conceded at the trial that the stick was used as a deadly weapon, guaranteeing the Petitioner's conviction for especially aggravated kidnapping. The Petitioner argues that because subsequent counsel did not present evidence of trial counsel's ineffective assistance in this regard at the motion for a new trial hearing, the Petitioner was deprived of meaningful appellate review and that had subsequent counsel presented such evidence, the appellate court would have granted a new trial. The State responds that although testimony was presented at the post-conviction hearing regarding this allegation, consideration of this issue is waived because the Petitioner did not allege in his post-conviction petition that subsequent counsel provided ineffective assistance by failing to allege trial counsel's ineffectiveness in conceding the stick was used as a deadly weapon. Alternatively, the State argues that the Petitioner failed to establish prejudice because he did not present trial counsel's testimony at the post-conviction hearing.

The record reflects that the Petitioner did not allege in his pro se or amended post-conviction petitions that subsequent counsel provided ineffective assistance by failing to present evidence at the motion for a new trial hearing that trial counsel provided ineffective assistance by conceding the stick used by the Petitioner was a deadly weapon. *See* T.C.A. §§ 40-30-104(d), (e); 40-30-106(g). In any event, evidence was presented at the post-conviction hearing that trial counsel conceded at the trial that the stick was used as a deadly weapon and that subsequent counsel alleged in the written motion for a new trial that trial counsel provided ineffective assistance in this regard. However, the record reflects that although trial counsel testified at the motion for a new trial hearing, subsequent counsel did not question trial counsel about conceding the stick was used as a deadly weapon. Appellate counsel raised the issue on appeal, and this court determined that "[w]ithout counsel's testimony . . . , we would be forced to speculate about the reasoning behind his decision and whether any prejudice resulted from his actions." *Charles Edward Wagner*, 2014 WL 60971, at *13. This court concluded, though, that counsel's conceding the stick was used as a deadly weapon was reasonable based upon professional standards and that based upon of the facts of this case, the stick was used as a deadly weapon. *Id*.

-22-

The Petitioner did not call trial counsel as a witness at the post-conviction hearing to testify about the concession, and subsequent counsel's opinion that trial counsel provided ineffective assistance is not dispositive or evidence of whether trial counsel in fact provided ineffective assistance. *See Black*, 794 S.W.2d at 757. The post-conviction court properly found that subsequent counsel provided deficient performance by failing to question trial counsel about the concession at the motion for a new trial hearing and that the Petitioner failed to establish prejudice as a result of subsequent counsel's deficient performance. Trial counsel's testimony regarding his concession was critical to determining whether subsequent counsel's deficient performance at the motion for a new trial hearing resulted in prejudice, and we will not speculate what trial counsel's testimony might have been. The record does not preponderate against the post-conviction court's findings, and the Petitioner is not entitled to relief on this basis.

## V. Note

The Petitioner contends that subsequent counsel provided ineffective assistance by failing to present evidence at the motion for a new trial hearing regarding trial counsel's failure to object to the admission of the handwritten note left on Ms. Wagner's car during the trial. The State responds that the post-conviction court properly denied relief because the Petitioner failed to establish prejudice.

The record reflects that a note was found on Ms. Wagner's car after the first day of trial testimony, that the State sought admission of the note, and that trial counsel did not object to its admission. Subsequent counsel alleged in the written motion for a new trial that trial counsel provided ineffective assistance by failing to object to the note's admission into evidence. However, subsequent counsel failed to question trial counsel at the motion for a new trial hearing about trial counsel's failure to object to the note. Appellate counsel raised the issue on appeal, and this court was unable to determine whether trial counsel provided ineffective assistance without any testimony from trial counsel regarding the note. *See Charles Edward Wagner*, 2014 WL 60971, at *14. As a result, this court concluded that the Petitioner had failed to establish that trial counsel provided deficient performance. *Id*.

The Petitioner did not call trial counsel as a witness at the post-conviction hearing, and as a result, he is once again unable to establish trial counsel's performance was deficient or that any deficiency resulted in prejudice. *See Black*, 794 S.W.2d at 757. Without establishing that trial counsel provided deficient performance and that the deficiency resulted in prejudice, the Petitioner is unable to establish that subsequent counsel's deficient performance resulted in prejudice. The record supports the post-conviction court's finding that subsequent counsel's failure to question trial counsel about the note at the motion for a new trial hearing was deficient performance. However, the Petitioner has failed to establish

prejudice without any testimony from trial counsel regarding his failure to object to the note's admission into evidence. This court will not speculate regarding trial counsel's potential testimony. The record does not preponderate against the post-conviction court's findings, and the Petitioner is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE